THE DETROIT EDISON COMPANY v PUBLIC SERVICE
COMMISSION

1. PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITIES—RATES—FUTURE
RATES—PAST LOSSES.

The Public Service Commission is empowered to set future rates
of a public utility so they are just, reasonable, and nonconfisca-
tory; the commission may not, however, set a future rate so as
to recover for a loss suffered by a utility in the past.

2. PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITIES—RATE MAKING—
LEGISLATIVE FUNCTION.

Public utility rate making is a legislative function not a judicial
function.

3. PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITIES—RATES—FACTORS
CONSIDERED.

Past expenses and costs of a public utility are factors to be
considered by the Public Service Commission in determining a
new rate so that the rate is fair and reasonable; however, past
expenses and costs are not recoverable under the future rate.

4. PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITIES—RATES—FUEL
COST ADJUSTMENT CLAUSE—STATUTES.

A fuel cost adjustment clause in a public utility's rate schedule,
which adjusts the rates to reflect a rise or fall in the utility's
fuel costs, is a method not to recoup former costs but to set
rates which more accurately reflect present costs; the Public
Service Commission is not prohibited from incorporating such a
clause in a utility's rate schedule (MCLA 460.6a; MSA
22.13[6a]).

REFERENCES FOR POINTS IN HEADNOTES
[1] 64 Am Jur 2d, Public Utilities § 199.
[2] 64 Am Jur 2d, Public Utilities § 89.
[3] 64 Am Jur 2d, Public Utilities §§ 193, 199.
[4] [No reference]
[5] 64 Am Jur 2d, Public Utilities §§ 130, 131, 276–291.
[6] 64 Am Jur 2d, Public Utilities §§ 230, 232.

5. ADMINISTRATIVE LAW—PUBLIC SERVICE COMMISSIONS—ORDERS—RE-
VIEW—CONSTITUTIONAL LAW—STATUTES.

Any dissatisfied party in interest may sue the Public Service
Commission to request vacation of a commission order setting
rates to be charged customers of a public utility; such court
review shall include, as a minimum, a determination of
whether the order was authorized by law (Const 1963, art 6,
§ 28, MCLA 462.26; MSA 22.45).

6. PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITIES—RATES—ORDERS—
ACCOUNTING PROCEDURES—VESTED RIGHTS.

An order of the Public Service Commission which allowed a
public utility to change its accounting procedure in regard to a
fuel cost adjustment in the utility's rate schedule and thereby
created a paper asset did not create a vested right or property
interest in that asset, and a subsequent order of the commis-
sion, on a request for a rate change, which took into considera-
tion the accounting change and ordered the utility to write off
the asset over a 10-year period was not unlawful, unreasonable
or confiscatory.

Appeal from Ingham, James T. Kallman, J.
Submitted January 3, 1978, at Lansing. (Docket
Nos. 30365, 30366.) Decided March 20, 1978. Leave
to appeal applied for.

Complaint by The Detroit Edison Company
against the Michigan Public Service Commission
to vacate an order of the commission directing
Detroit Edison to write off an accounting asset
over a ten-year period. The Attorney General in-
tervened as a defendant. Complaint by the Attor-
ney General against the Public Service Commis-
sion also seeking to vacate the same commission
order. The Detroit Edison Company intervened in
this action as a defendant. The cases were consoli-
dated and a judgment was entered vacating the
commission order and directing the commission to
enter an order allowing Detroit Edison to secure
the amount of the asset through a surcharge. The
Public Service Commission appeals, and the Attor-
ney General cross-appeals. Ford Motor Company

was allowed to intervene as an appellant. Reversed and remanded.

*Foster, Swift, Collins & Coey, P. C.* (by *Theodore W. Swift* and *David W. McKeague),* and *Leon S. Cohan, Dean J. Landau* and *Christopher C. Nern,* Detroit Edison Legal Department, for The Detroit Edison Company.

*Walter V. Kron, Robert J. Taube* and *James E. Riley,* Assistants Attorney General, for the Michigan Public Service Commission.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Hugh B. Anderson* and *Roderick S. Coy,* Assistants Attorney General, for the Attorney General.

*Pat D. Conner (James D. Irvine,* of counsel), for intervening appellant Ford Motor Company.

Before: V. J. BRENNAN, P. J., and D. E. HOL-BROOK and R. B. Martin,* JJ.

R. B. MARTIN, J. These cases present "simple" "complex" issues. The parties agree on the facts but labelled events or procedures differently to arrive at disparate legal conclusions.

Let us detail the factual situations.

On *September 20, 1973* Detroit Edison, Case No. *U-4426,* applied to the Michigan Public Service Commission for authority to include a fuel adjustment clause (FCAC) in residential rate schedules as permitted by MCLA 460.6a (2); MSA 22.13(6a) (2). The Attorney General intervened.

On *February 4, 1974* in *U-4426* the MPSC found the company "proposed to *amend* its electric rate

---

* Circuit judge, sitting on the Court of Appeals by assignment.

schedules * * * to *incorporate* therein fuel clauses which will permit the *adjustment* of such rates to *reflect* changes in fuel costs." (Emphasis added.)

The commission reviewed the situation and found "Accordingly, it is proper for a fuel adjustment clause, such as proposed by Applicant, to reflect transmission system and distribution losses".

The commission then ordered:

"A. The Detroit Edison Company is hereby authorized to incorporate fuel adjustment clauses in its electric rate * * * as contained in Exhibit A * * *

"B. The revised rate schedules attached hereto as Exhibit A are hereby approved for electric service rendered on and after February 5, 1974."

The commission ordered the company to certify monthly the calculation of the FCAC and to state the fuel adjustment separately on its bills.

Exhibit A set out the procedure for determining the change in billing amounts and said "The adjustment shall apply to the second billing month following the calendar month in which the fuel is burned".

On *April 15, 1974,* case *U-4570,* Edison petitioned for a rate increase to produce an additional $93,048,000 revenue.

While this petition was pending, Detroit Edison filed application *F-647* on *June 18, 1974,* for an order permitting it to revise its accounting procedures. Its then-existing procedures caused the cost of fuel to be recorded in its books as fuel expense in the month the fuel was used. With the time lag provided in U-4426, the order of February 4, 1974, and existing procedures, fuel costs over the base of 5.87 mills per KWH in January would be billed to

industrial customers in February and to domestic and commercial customers in March.

On *July 29, 1974,* case *F-647,* MPSC approved the request for the accounting change. What happened thereafter was that Edison set forth as an asset the deferred charge it could not collect until the billing one or two months later. The amount of the bills for each month remained exactly the same under the new accounting system as they were under the old accounting method. However, because the expected increase in billing was listed as an asset, the company's financial picture looked better. Its position in the stock and borrowing markets was enhanced.

Detroit Edison claims the increased fuel costs placed in the deferred charge asset account came to $26,349,806 for the months of December, 1974, and January, 1975.

On *February 3, 1975,* the *U-4570* petition was acted upon. The commission granted a general rate increase to the company. The order also dealt with the FCAC. The commission said,

"Applicant's approved fuel cost adjustment clause (FCAC) is intended to recover all increases in fuel costs which are beyond Applicant's control on a timely basis. As is normal in a rate proceeding, the parties assumed that changes in fuel costs would therefore be reflected in timely adjustments under the FCAC as approved in Applicant's tariffs.

"*Billing Lag*

"The Commission finds, however, that Applicant's currently approved FCAC does not in fact achieve the goal of fully recognizing changes in fuel costs in a timely manner. Therefore the Commission finds it necessary to correct the operation of the clause to reduce the existing time lag between the incurring and the reflecting of increased or decreased costs of fuel in the fuel adjustment. This lag has become a significant

problem with rapidly escalating cost of fuels and with the potential assessment of proposed new taxes on these fuels.

"In the Commission's Order in Case No. F-647, dated July 29, 1974, Applicant was granted permission to record increases in the cost of fuel burned for electric generation not recovered through operation of the FCAC in a balance sheet account rather than an income statement account. This was approved since Applicant was experiencing a significant lag in the recovery of higher fuel costs. No increased revenues were received by Applicant as the result of this accounting treatment. This item was removed from an expense (or income statement) account and transferred to a deferred charge (or balance sheet) account. As a result of this accounting treatment, net income per books could no longer be adversely affected during a period of rising fuel costs by the lag contained within the FCAC provision. This was desirable since it allowed Applicant greater financing flexibility due to the improved financial position reflected on its books. Cash flow, however, continued to be adversely affected since Applicant was unable to offset a significant portion of its increased fuel expense outlays with increased revenues.

"The Commission finds that a FCAC which recognizes changes in the per unit cost of fuel burned for electric generation in a timely manner is appropriate and in the public interest. To assure fair treatment to both Applicant and the consumer, the FCAC should operate in a manner which does not erode the quality of Applicant's earnings due to increasing fuel costs and at the same time charges the consumer no more than the actual per unit cost of fuel burned.

"The Commission finds that the existing FCAC should be modified with respect to the procedure used in determining the appropriate billing month adjustment factor so as to effectively eliminate the lag. This should be accomplished using actual figures as the basis for calculation of the adjustment factor. * * * As modified, the clause will effectively eliminate any annual under-collection or over-collection of incurred costs of fuel burned by Applicant while continuing to calculate the adjustment factor on the basis of actual fuel cost data.

"Since this modification of the FCAC effectively elimi-
nates the lag, it also removes the need of Applicant's
accounting for deferred fuel costs as directed by the
Commission's Order in Case No. F-647. As such, Appli-
cant should file an application with the Commission for
a determination in a separate proceeding as to disposi-
tion of the accumulated fuel cost deferral up to the
effective date of this order."

We do note that the commission, on the very next
page in commenting on other revisions, states,

"This Commission recognizes that a fuel cost adjust-
ment clause is intended to reasonably reflect increases
or decreases in fuel costs on a timely basis."

In effect the commission said "Utility and cus-
tomers, there's still a real lag between expenses
for fuel that is constantly rising in price and the
billings. We will alter our rules. The bills sent out
for a particular month should cover the actual
increase of expenses because of increased fuel costs
for that particular month. This must be deter-
mined, of course, on past experience."

Quick as a wink, on *February 6, 1975,* case *U-
4758,* Detroit Edison applied for their right to
collect the $26,349,806 in deferred charges shown
by its books as increased costs for December, 1974,
and January, 1975, waiting to be billed in follow-
ing months and now not allowed.

The administrative law judge proposed Edison
be allowed a surcharge for 12 months to secure
this sum.

On December 22, 1975, the commission rejected
this proposal and ordered Edison to write off the
$26,349,806 deferred charge asset against income
over ten years.

On *January 19, 1976,* Edison filed in circuit

court to review this order. On *January 21, 1976,*
the Attorney General, likewise, filed in circuit
court appealing the December 22, 1975, order. He
also intervened in the Edison appeal and Edison
intervened in the Attorney General's suit.

The circuit judge issued an opinion on August
10, 1976, and a judgment was entered on Septem-
ber 27, 1976. The judgment vacated the Public
Service Commission order and remanded the mat-
ter to the commission to enter an order as pro-
posed by the administrative law judge. The Public
Service Commission followed this requirement on
October 1, 1976.

The parties appeal in both cases. Ford Motor
Company was granted the right to intervene in the
appeal. Ford Motor claims that since the time the
surcharge became effective, they have built and
are operating electric steel furnaces. They allege
the surcharge will cost them an additional $160,-
000 over the usual rates and they received not one
kilowatt-hour or fraction thereof of electricity in
return for this surcharge.

From these given facts, Detroit Edison believes
it should be allowed to surcharge against present
customers the $26,349,806 of fuel costs less certain
amounts which Edison recognizes as being im-
proper to include. The present amount requested is
thus $23,507,000. The PSC, the Attorney General
and Ford believe such surcharges should not be
allowed.

Let's look at some of the law involved:

The commission was created with power to regu-
late the rates of electric utilities; MCLA 460.6;
MSA 22.13(6). In determining rates the commis-
sion must consider many, many factors including
the cost of fuel for the production of electric
power. The rate determination may take months

and months. To offset this delay the Legislature permits fuel costs adjustment charges (FCAC). They permitted it first for commercial users. 1955 PA 172 added to the rate making procedure,

"Nothing contained in this section shall be construed to prohibit the commission from permitting the incorporation of fuel adjustment clauses in rate schedules for service other than domestic service pursuant to notice and hearing thereon."

In 1972 this clause was omitted and a new paragraph stated,

"This section or any other law does not prohibit the incorporation of fuel or purchase gas adjustment clauses in rate schedules." MCLA 460.6a(2); MSA 22.13(6a)(2).

Michigan law gives the commission the right to set future rates so they are just, reasonable and nonconfiscatory. The PSC cannot, however, set a future rate so as to recover for a loss suffered in the past. *Michigan Bell Telephone Co v Public Service Commission,* 315 Mich 533; 24 NW2d 200 (1946), *General Telephone Co of Michigan v Public Service Commission,* 341 Mich 620; 67 NW2d 882 (1954), and *Michigan Consolidated Gas Co v Public Service Commission,* 389 Mich 624; 209 NW2d 210 (1973).

Rate making is a legislative and not a judicial function. *Michigan Central R Co v Wayne Circuit Judge,* 156 Mich 459; 120 NW 1073 (1909), *Detroit v Michigan Public Utilities Commission,* 288 Mich 267; 286 NW 368 (1939), and *Louisville & Nashville R Co v Garrett,* 231 US 298; 34 S Ct 48; 58 L Ed 229 (1913).

This raises the fundamental question as to what

our fuel cost adjustment charge actually is. Is it an appendage to and part of the rate making power? If so, can the commission, by its use, set rates to cover past expenses and losses? We would think not.

Past expenses and costs are factors to be considered in determining what the new rate should be so it is fair and reasonable. Past expenses and costs are not recoverable under a future rate. If a rate structure is wrong and causes a utility to lose $1,000,000, the utility cannot recover that in its new rate. The commission must certainly raise the rates so the loss will not continue. If the rate structure is wrong so the utility gains $1,000,000 more profit than is reasonable and just, the commission cannot order a refund. It can certainly lower the rate so there will be no excess profit in the succeeding years.

Is the fuel cost adjustment charge a special power given to the commission to specifically raise rates enough to cover rapidly escalating fuel costs? We think not. We note two things: (1) The statutory language is in a section dealing with the commission's procedures. (2) The language is not stated as an affirmative grant of power.

MCLA 460.6a; MSA 22.13(6a) deals generally with the procedure the commission must follow when getting an application for a rate increase. It grants the PSC the right to set its rules and procedures. It then says:

"This section or any other law does not prohibit the incorporation of fuel or purchase gas adjustment clauses in rate schedules."

This is not a statute affirmatively giving the commission the power to set a rate to repay for

added fuel costs. It does not try to affirmatively overrule our Supreme Court's position that the commission cannot grant a rate increase to pay for past losses or expenses.

The Commission is simply told the law does not prohibit it from incorporating fuel or gas adjustment clauses in rate schedules. This means the PSC can insert in rate schedules a formula that will raise and lower rates, depending on whether the utility's fuel costs rise or fall. The adjustment is made automatically per formula without the necessity of applications, hearings, staff investigations and reports. It is a method not to recoup former costs but to set rates which more accurately reflect present costs so as to more certainly give a just and reasonable income.

With this in mind, we look at just exactly what happened in our case. Petition F-647 was filed June 8, 1974. An order in F-647 was made on July 29, 1974. Therein Edison was given permission to change its bookkeeping and accounting procedures. There had been and remained a time lag of one to two months from the time fuel was purchased to the time the fuel was paid for by billings for electricity. However, the income the company expected to receive one or two months later was now listed as an asset on the company's books even though nothing had been changed except the bookkeeping system. The December-used fuel still resulted in setting a new rate for the electric billing in January or February. The company was allowed to set this expected receipt up as an asset. This was valuable to them in the sale of stock and raising money through bond issues or other sources.

In the meantime from April 15, 1974 (before F-647 was filed) to February 3, 1975 (after F-647 was

decided) the commission was holding hearings, investigating and deciding U-4570, an application for a rate increase. F-647 very carefully avoided the question of a rate increase. It went to accounting methods alone. In fact in F-647 the company specifically said,

"With respect to any electric rate order to be issued in Case No. U-4570 or any case subsequently filed or determined, *the accounting entries, interpretation and treatment herein authorized shall not serve as a basis in whole or in part, directly or indirectly, for a rate base or cost of service greater than would be determined had such accounting entries, treatment and interpretation not been made or approved,* all without prejudice to the right of The Detroit Edison Company to request the benefit in rate proceedings of future orders of the Commission which establish accounting entries, interpretations or treatments other than those established in this proceeding.

"The Detroit Edison Company understands and agrees that the Staff and the intervenors in this proceeding, and any other intervenors in Case No. U-4570 or in future electric rate cases of the Company, are totally free to show or contend that *the reported net income, if any, arising from the accounting entries, interpretation or treatment approved by the Commission in this case should be considered and included as a reduction of the Company's income and revenue requirements in Case No. U-4570* and in future electric rate cases, all without prejudice to the right of The Detroit Edison Company to contend to the contrary."

The commission then found,

"C. The accounting treatment authorized herein, while not improving the Applicant's cash flow, will provide a better matching of changes in fuel costs with fuel adjustment revenues, and thus a better definition of accounting net income. *To the extent that such improvement in reported net income will assist the*

*Applicant in sales of its debt and equity securities, the change in accounting treatment of fuel expense is in the interest and to the benefit of the Company's customers and investors.*

"D. The accounting proposed by the Applicant will have no effect on the manner in which fuel clause billings to customers are calculated."

The commission then ordered that the company would be authorized,

"(a)·To the extent that costs of fuel burned in any month (i) are subject to billing in a later month or (ii) will produce a credit to customers, each pursuant to fuel cost, adjustment clauses, such costs or credits shall be deferred until such time as they are reflected in billing adjustments made pursuant to such fuel cost adjustment clauses.

\* \* \*

"(b) The deferred fuel expense or fuel credit shall be charged or credited to operations in the amount of revenue billed or credit granted under the applicable approved fuel clauses for the particular month.

\* \* \*

"2. The revised accounting procedures, as directed above, are to be effective January 1, 1974.

"3. *This order shall not cause an increase in rate base or cost of service, for ratemaking purposes as set forth in the stipulation and amendment to the application recited in Finding B above."* (Emphasis added.)

The February 3, 1975, decision in the rate case U-4570 granted a rate increase. It also considered the position of FCAC and changed the billing procedures so the rates were more nearly and quickly syncronized with the rise or fall of fuel costs. It removed the time lag in the old accounting procedures and permitted Edison to have a rate increase *now* based on a rise in fuel prices *now.* (This, of course, is not literally true to the

exact dollar but is as close as mathematicians, accountants, bookkeepers and bureaucrats can attain.)

This left Edison with a deferred charge asset of some $26,000,000 on its books. It also gave it *more* income right now without a one or two month lag. If the fuel costs were going up at the rate of $13,000,000 a month, Edison wasn't going to have to wait one or two months to have a rate based on the month's $13,000,000 increase. It could add it to its base cost and to the customer's bill and collect it *now*. Therefore, under U-4570 procedures with continually rising prices, Edison was collecting more in a year's time than it would have if the procedures had not been changed. This increment to its revenue should have given it a just and reasonable rate according to the commission.

The Court feels the commission had a right to alter the rate and accounting structure in U-4570. This left the company with a paper asset of $26,000,000 and something had to be done with it. The commission decided to permit it to be written off over ten years.

Were the commission's actions proper? What is the extent of the power of review by the trial court?

The statute, MCLA 462.26; MSA 22.45, provides that any dissatisfied party in interest may sue the commission in the Ingham Circuit Court to request the commission's order be vacated,

"   * * * on the ground that the rate or rates * * * are unlawful or unreasonable, or that any such regulation, practice or service fixed in such order is unreasonable; * * * All suits brought under this section * * * shall proceed, be tried and determined as other chancery suits. Any party * * * may introduce original evidence in addition to the transcript of evidence of-

fered to said commission, and the said circuit court in chancery is hereby given jurisdiction of such suits and empowered to affirm, vacate or set aside the order of the commission in whole or in part, and to make such other order or decree as the court shall decide to be in accordance with the facts and the law;

\* \* \*

"(e) In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."

This statute, of course, is controlled by Const 1963, art 6, § 28,

"All final decisions, findings, rulings and orders of any administrative officer or agency \* \* \* shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record."

The dissent in *Michigan Consolidated Gas Co v PSC, supra,* felt that insofar as MCLA 462.26 purported to allow a *de novo* review it was unconstitutional. The majority did not meet this problem head on. The majority felt the trial court's issuing of an injunction was based on evidence the commission failed to consider and the injunction was to be effective only until the commission actually set a rate.

In our case the facts are not really disputed. The review then must go, as a minimum, to determine whether the order was authorized by law. It was authorized if it was not confiscatory or unreasona-

ble. We should note again that F-647 was an application to amend accounting procedures. It was filed and heard during the time the rate change application U-4570 was being heard. The commission knew about and considered the accounting procedure change when it was considering the rate change request. In F-647 the company amended its application,

"With respect to any electric rate order to be issued in Case No. U-4570 or any case subsequently filed or determined, the accounting entries, interpretation and treatment herein authorized shall not serve as a basis in whole or in part, directly or indirectly, for a rate base or cost of service greater than would be determined had such accounting entries, treatment and interpretation not been made or approved, all without prejudice to the right of The Detroit Edison Company to request the benefit and rate proceedings of future orders of the Commission which establish accounting entries, interpretations or treatments other than those established in this proceeding.

"The Detroit Edison Company understands and agrees that the Staff and the intervenors in this proceeding, and any other intervenors in Case No. U-4570 or in future electric rate cases of the Company, are totally free to show or contend that the reported net income, if any, arising from the accounting entries, interpretation or treatment approved by the Commission and this case should be considered and included as a reduction of the Company's income and revenue requirements in Case No. U-4570 and in future electric rate cases, all without prejudice to the right of The Detroit Edison Company to contend to the contrary."

If the accounting procedures had not been changed by F-647, Edison would *not* have accumulated a deferred charge asset of $26,349,000. This was a paper asset created at Edison's request by an order relative to an accounting procedure

change and not created by an order relative to a rate change petition. We will not consider the wisdom of the order.

Edison claims this created a vested right, a property interest in the accounting figure asset. It did not. The commission, in F-647, was not setting a rate, was not determining what the basis for a rate should be nor was it altering any FCAC clause. It was acting on Edison's request for a bookkeeping change to take place while the commission was considering what kind of rate change, if any, should be made to permit a reasonable profit for Edison. If the commission was guaranteeing a recoverable asset as part of a new rate base, it would not have required the amendment to Edison's application quoted above. If we allow it as a recoverable asset, we permit retroactive rate making to recover past costs. This we cannot do.

Edison claims the commission would deprive it of property without due process of law since the rates must be sufficient to yield a reasonable return on the value of property being used. But when the F-647 order was entered, the commission was at that time considering the total rate picture and soon afterwards entered a new rate order with the knowledge of what F-647 had done to Edison's financial picture. Edison has not claimed the order in U-4570 did not yield a fair return. Yet that order took into consideration the accounting changes in F-647. U-4570's order gave Edison an immediate increase in rates on the basis of all the elements determining rates, including FCAC.

We believe the commission's order was not unlawful, unreasonable or confiscatory. At Edison's request the commission permitted the company to improve its position in the stock, bond and borrowing market. It did not guarantee the collection of

rates to cover the created bookkeeping entry. It was, at the very time, considering the whole rate picture and all the multitudinous factors that would create the rate structure. When the petition to alter accounting methods specifically said it was not to be used to create a rate base greater than could be determined had the change not been made, Edison should not now come in and claim confiscation of a paper asset.

We reverse the circuit court ruling. We affirm the December 22, 1975, order of the commission. We remand to the trial court to be further remanded to the commission for such action as is necessary to conform to this opinion.