### In re Central Vermont Public Service Corporation

[473 A.2d 1155]

Nos. 82-460 and 83-240

Present: Hill, Underwood, Peck and Gibson, JJ., and Larrow, J. (Ret.), Specially Assigned

Opinion Filed January 13, 1984

---

*Donald L. Rushford* and *Joseph M. Kraus,* Rutland, for Plaintiff-Appellee.

*Gerald R. Tarrant, Michael L. Burak, Peter H. Zamore,* and *Michael Marks,* Montpelier, for Defendant-Appellant.

**Gibson, J.** The Department of Public Service (the Department) appeals from two orders of the Public Service Board (the Board) approving a power adjustment clause for Central Vermont Public Service Corporation. For the reasons stated herein, we reverse.

On September 4, 1980, Central Vermont filed a petition for a $3,450,000 rate increase; on November 26, 1980, the company filed for an additional $18,000,000 increase. In its second filing Central Vermont included a request for a power adjustment clause. The Public Service Board consolidated the rate requests for hearing and, after sixteen days of hearings, issued its decision on December 4, 1981. In its decision the Board rejected the proposed power adjustment clause, but retained jurisdiction to consider the possibility of some other mechanism that would allow the company to recover its reasonable power costs on a timely basis.

On December 14, 1981, Central Vermont filed a new proposal for a power adjustment clause. Further hearings were held, and on July 2, 1982, the Board, by a two-to-one vote, ap-

proved a modified form of power adjustment clause for Central Vermont.

Pursuant to the Board's approval, Central Vermont, on December 15, 1982, filed its first power adjustment tariff, to take effect February 1, 1983. Denying a request from the Department of Public Service that the tariff be suspended, the Board allowed the tariff to go into effect as scheduled, but, pursuant to 30 V.S.A. § 227(b), ordered an investigation into the justness and reasonableness of the new rate. Following hearings, the Board, on April 29, 1983, issued a decision finding the tariff to be reasonable. The Department appeals from the Board's orders of July 2, 1982, and April 29, 1983.

The tariff, referred to by the parties as the current power year (CPY) tariff, is designed to allow the company full recovery of its purchased power and energy costs on an annual basis, and operates in the following manner. On or before October 15 of each year Central Vermont must file preliminary estimates of its power and energy costs for the ensuing calendar year, as well as estimates of sales for the same period. By December 15 of each year Central Vermont is required to file new rates based on a forecast of its sales and its power and energy costs for the following calendar year; at the same time Central Vermont must also submit a statement of its actual sales and power and energy costs for the twelve-month period that ended October 31. The proposed rates will, unless suspended, go into effect on February 1, some 47 days after the date of filing.

Prior to the February 1 effective date, the Board must either approve the change or suspend it. 30 V.S.A. § 225(b). If the Board accepts the change, the changed rate will take effect as scheduled, and there will be no further proceedings. If the Board suspends the change or if, as in this instance, the Board institutes an investigation on its own initiative under § 227(b), hearings will then be held.

The most controversial aspect of the power adjustment clause is the mechanism referred to as the "true-up." The "true-up" is a reconciliation of the actual sales revenues and power and energy costs for the year ending October 31 with those that were forecast one year earlier. If the historical data reveal that Central Vermont collected rates in excess of its predicted power and energy costs, the over-collection, with in-

terest, is refunded to customers by allowing a credit on the rates for the following year. If the historical data show that Central Vermont failed to recover all its power and energy costs, the shortage is collected by imposing a surcharge on the following year's customers.

The Department contends that the CPY violates Vermont statutory and case law in numerous respects. One series of objections challenges the tariff as a device that improperly sets rates in two stages, the second stage coming one year after filing and only after the service has been provided to the customer. It is the Department's position that the Board's action on each rate filing is not complete until the "true-up" has taken place. Accordingly, the Department contends that the CPY violates the requirements of 30 V.S.A. § 225(a) and Vermont case law relative to advance notice of rate changes; § 225(a)'s prohibition against amending filings; § 227(a)'s requirement that rate cases be decided within seven months of filing; and § 229's prohibition against assessing rates different from those in effect when service was rendered.

We disagree that the CPY is a two-stage proceeding. The CPY is not a temporary rate subject to revision one year after filing, nor is it an amendment to a pending rate case. Rather, each CPY filing is a separate proceeding based on a new test year. Each year the filing must comply with the notice requirements of § 225 and is subject to suspension and public hearings as in the case of any new rate filing. The order the Board issues is final, and absent appeal, the case is closed; thereafter, the company's rates may be changed only by following the statutory procedures for a new rate filing. Accordingly, we will not address further the objections of the Department based on its view of the CPY as a two-step process.

The Department further contends that the CPY illegally reinstates recoupment which has been abolished by the legislature, 1981, No. 226 (Adj. Sess.), § 4, implements rate changes on the basis of selective data, violates the public's right to a fair hearing by requiring a decision within too short a period of time, and institutes retroactive ratemaking. Finally, the Department contends that the Board's findings and conclusions are inadequate and contradictory.

Before embarking on a consideration of the issues, we will review the guidelines the Board and this Court must follow.

## I.

Under current Vermont law a company subject to the Board's jurisdiction may not change its rates except upon forty-five days' notice to the Board and to the Department, and such notice to other parties as the Board directs. 30 V.S.A. § 225 (a). It is the duty of the Department to investigate the justness and reasonableness of the proposed change, and at least fifteen days prior to the effective date, the Department must recommend to the Board that it either accept the change or reject it. § 225 (b). If the Department opposes the change, the Board must hold a hearing and, prior to the effective date, issue an order either accepting the change and allowing it to go into effect or suspending it. *Id.* Such hearing must be held expeditiously, since the Board must give the company notice of any suspension at least six days prior to the effective date of the proposed change. § 226 (a). The Board must also be alert to give at least twelve days' notice in advance of any hearing. § 10. If the Board suspends the change, it must hold further hearings and issue an order within seven months of the effective date; otherwise, the change will then automatically go into effect and become final. § 227 (a).

The short time frame puts great pressure on the Department, which must investigate and report to the Board within 30 days on a matter that a utility may have had months to prepare. Further, the Department must be prepared to go to hearing on very short notice to justify any objection it has to a proposed change. However, the Department's burden initially, if it objects to a proposed change, is merely to convince the Board that there is good reason to suspend. Further hearings will then follow and the Department will have additional time to prepare its case. In this instance, the Board chose not to suspend, but did exercise its right under § 227 (b) to order an investigation. Hearings followed, as contemplated by the statute, and there was adequate opportunity for all parties to be heard. The CPY tariff thus complies with the statutory procedure established by the legislature, and we are unable to say on the record before us that the public's right to a fair hearing has been violated.

## II.

The crux of this case is the Department's contention that the CPY tariff constitutes illegal retroactive ratemaking. Retroactive ratemaking has been defined as "the setting of rates which permit a utility to recover past losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established." *State ex rel. Utility Consumers Council of Missouri, Inc.* v. *Public Service Commission,* 585 S.W.2d 41, 59 (Mo. 1979) (citing *Board of Public Utility Commissioners* v. *New York Telephone Co.,* 271 U.S. 23, 31 (1926)). In other words, retroactive ratemaking is a device that enables a utility to balance its accounts for a prior period of time by making a future adjustment in its rates. In this case, the CPY allows Central Vermont annually to balance its prior year's power and energy accounts through adjustments on its bills to future customers.

The arguments against retroactive ratemaking are: (1) that it violates the statutory requirement that ratepayers should receive advance notice of all rate changes; (2) that it unfairly forces the ratepayer to pay a utility's past deficits, incurred when some ratepayers may not even have been customers; (3) that it promotes inefficient utility operation, resulting in higher costs to the public; and (4) that it deprives either the utility (if forced to make a refund) or the ratepayer (if required to pay a surcharge) of property without due process of law.

Central Vermont argues that (1) there is no prohibition in Vermont against retroactive ratemaking; (2) the CPY tariff does not constitute retroactive ratemaking; and (3) if it is retroactive ratemaking, it is not illegal. In support of its last two contentions, Central Vermont points to the Board's order of February 17, 1983, where, in denying the Department's motion to dismiss or suspend Central Vermont's first CPY tariff filed on December 15, 1982, the Board, in justification of its decision, describes power purchase costs as "extraordinary" expenses "because of their unpredictability and volatility."

The Public Service Board derives its authority from the statutes, and it cannot exceed the bounds of that authority.

*In re Town of Springfield,* 143 Vt. 483, 491, 469 A.2d 375, 379 (1983) ; *In re New England Telephone & Telegraph Co.,* 131 Vt. 310, 315, 305 A.2d 598, 601 (1973). The choices the Board makes in the area of rates and service are subject to great deference in this Court so long as they are directed at proper regulatory objectives. *In re Green Mountain Power Corp.,* 142 Vt. 373, 380, 455 A.2d 823, 825 (1983). In performing its rate-setting duties, the Board may consider a utility's recent past operating experience with such adjustments as will make the test period reflect typical conditions in the immediate future. *In re Burlington Electric Light Department,* 135 Vt. 114, 119, 373 A.2d 514, 518 (1977) ; *Letourneau* v. *Citizens Utilities Co.,* 128 Vt. 129, 133, 259 A.2d 21, 23 (1969). As this Court has previously stated, "[r]ates are to be set for the future," *id.,* i.e., "for the time period at issue." *In re Central Vermont Public Service Corp.,* 141 Vt. 284, 289, 449 A.2d 904, 907 (1982).

The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used *at the time that it is being used for the public service.*

*Board of Public Utility Commissioners* v. *New York Telephone Co., supra,* 271 U.S. at 31 (emphasis added).

In discharging its duty to set rates that are "just and reasonable," 30 V.S.A. § 218, the Board has no statutory authority to make whole either the utility company or its customers for inequities that existed in the past. "Subsequent cases cannot correct past errors." *In re Central Vermont Public Service Corp., supra,* 141 Vt. at 290, 449 A.2d at 907–08 ; accord *In re Petition of New England Telephone & Telegraph Co.,* 139 Vt. 578, 586, 433 A.2d 263, 268 (1981).

The United States Supreme Court has rejected the practice of retroactive ratemaking.

Where the [Interstate Commerce] Commission has, upon complaint and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, subject a carrier which

conformed thereto to the payment of reparation measured by what the Commission now holds it should have decided in the earlier proceeding to be a reasonable rate.

*Arizona Grocery Co.* v. *Atchison, Topeka & Santa Fe Railway,* 284 U.S. 370, 390 (1932) ; see also *Federal Power Commission* v. *Tennessee Gas Transmission Co.,* 371 U.S. 145, 153 (1962) (when a rate is found by the Commission to be too low, "the company cannot recoup its losses by making retroactive the higher rate subsequently allowed . . . .") ; *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U.S. 287, 313 (1933) ("Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future.") ; *Galveston Electric Co.* v. *City of Galveston,* 258 U.S. 388, 395 (1922) (past losses are not "an element to be considered in deciding . . . whether [a] rate is confiscatory.").

Many state courts have also prohibited retroactive ratemaking. See, e.g., *City of Los Angeles* v. *Public Utilities Commission,* 7 Cal. 3d 331, 356–57, 497 P.2d 785, 803–04, 102 Cal. Rptr. 313, 332 (1972) ; *Westwood Lake, Inc.* v. *Dade County,* 264 So. 2d 7, 12 (Fla. 1972) ; *Georgia Public Service Commission* v. *Atlanta Gas Light Co.,* 205 Ga. 863, 883–84, 55 S.E.2d 618, 631 (1949) ; *Metropolitan District Commission* v. *Department of Public Utilities,* 352 Mass. 18, 26, 224 N.E.2d 502, 508 (1967) ; *Detroit Edison Co.* v. *Michigan Public Service Commission,* 82 Mich. App. 59, 67, 266 N.W.2d 665, 669–70 (1978) ; *Mississippi Public Service Commission* v. *Home Telephone Co.,* 236 Miss. 444, 455, 110 So. 2d 618, 624 (1959) ; *Utility Consumers Council of Missouri, Inc.* v. *Public Service Commission, supra,* 585 S.W.2d at 58–59; *Montana Horse Products Co.* v. *Great Northern Railway,* 91 Mont. 194, 202, 7 P.2d 919, 925 (1932) ; *Southwest Gas Corp.* v. *Public Service Commission,* 86 Nev. 662, 669, 474 P.2d 379, 383 (1970) ; *In re Granite State Electric Co.,* 120 N.H. 536, 538, 421 A.2d 121, 122 (1980) ; *New Jersey Power & Light Co.* v. *State Department of Public Utilities,* 15 N.J. 82, 94, 104 A.2d 1, 7 (1954) ; *Yonkers Electric Light & Power Co.* v. *Maltbie,* 245 A.D. 419, 423, 283 N.Y.S. 839, 844 (1935) ; *State ex rel. Utilities Commission* v. *Edmisten,* 291 N.C. 451, 468, 232 S.E.2d 184, 194–95 (1977) ; *Narragansett Electric Co.* v. *Burke,* 415 A.2d 177, 179 (R.I.

1980) ; *Producers' Refining Co.* v. *Missouri, K. & T. Railway,* 13 S.W.2d 680, 681 (Tex. 1929) ; *City of Norfolk* v. *Virginia Electric & Power Co.,* 197 Va. 505, 511, 90 S.E.2d 140, 145 (1955) ; *Friends of the Earth* v. *Public Service Commission,* 78 Wis. 2d 388, 411, 254 N.W.2d 299, 309 (1977).

The Rhode Island Supreme Court has stated its objections in the following language:

> The rule against retroactive ratemaking serves two basic functions. Initially, it protects the public by ensuring that present consumers will not be required to pay for past deficits of the company in their future payments. The Supreme Court of New Jersey has expressed this legitimate concern as follows:
>
>> "The present practice, as set forth in these cases, is fair to the public utility, for it can act as speedily as it sees fit to move for a correction of inadequate rates, and it is fair to the consumer in safeguarding him from surprise surcharges dating back over years that he had a right to assume were finished business for him and possibly over years when he was not even a consumer." (citations omitted.)
>
> The rule also prevents the company from employing future rates as a means of ensuring the investments of its stockholders. (citation omitted). If a utility's income were guaranteed, the company would lose all incentive to operate in an efficient, cost-effective manner, thereby leading to higher operating costs and eventual rate increases.

*Narragansett Electric Co.* v. *Burke, supra,* 415 A.2d at 178–79.

On occasion, utilities have been allowed to assess a surcharge to recoup extraordinary past expenses. See *id.* (rule against retroactive ratemaking does not bar recovery of extraordinary costs incurred in restoring service to customers after extraordinary winter ice storm). But see *Petition of Central Vermont Public Service Corp.,* 116 Vt. 206, 71 A.2d 576 (1950) (risk of economic catastrophe rests on the owners and losses due to flood damage are not recoverable in form of depreciation). The recovery of certain past expenses has also been allowed when authorized by statute. 30 V.S.A. § 226 (b) previously allowed recoupment at the end of a rate case so that a utility could re-

cover revenues it would have received if the rates finally approved had gone into effect on the date originally requested; however, this statute was repealed on May 6, 1982, 1981, No. 226 (Adj. Sess.), § 4, and utility companies are no longer authorized such recoupment.

At the present time, § 226 provides that, if a temporary rate increase is placed in effect pending final determination of a rate case, the utility must refund, with interest, all sums collected in excess of the rate finally determined to be just and reasonable; § 227 provides similar relief to ratepayers when the Board initiates a rate investigation on its own motion and eventually determines that rates should be reduced. These are the only statutes now in effect that permit a retroactive adjustment in rates.

■ We hold that, unless authorized by statute, a rate that requires consumers to pay for past deficits of a utility or that requires a utility to refund to consumers a portion of its previously earned profits constitutes illegal retroactive ratemaking. *Arizona Grocery Co. v. Atchison, Topeka & Sante Fe Railway, supra; Board of Public Utility Commissioners v. New York Telephone Co., supra; Galveston Electric Co. v. Galveston, supra; In re Central Vermont Public Service Corp., supra; In re Petition of New England Telephone & Telegraph Co., supra.*

On February 17, 1983, the Board issued an opinion denying the Department's motion to dismiss or suspend Central Vermont's first CPY tariff filed on December 15, 1982. In its opinion, the Board reexamined some of the arguments against the CPY tariff and offered further justification in support of the tariff. In response to the argument that the CPY tariff constituted retroactive ratemaking, the Board cited the statutory authorization of §§ 226 and 227, allowing retroactive adjustments in favor of ratepayers, for the proposition that "retroactivity is not per se illegal in Vermont," and, further, maintained that "the costs involved in the CPY adjustment are extraordinary because of their unpredictability and volatility."

■ The statutes referred to by the Board do not support the CPY. Sections 226 and 227 are designed to ensure that rate changes that are the subject of a rate case take effect in seasonable time so that neither the utility nor the ratepayers are

prejudiced by the delays involved in deciding the case. The CPY seeks to go further and retroactively impose adjustments over and above the rates eventually determined to be just and reasonable.

Retroactivity, even where permissible, is not favored, except upon the clearest mandate.

*Claridge Apartments Co.* v. *Commissioner*, 323 U.S. 141, 164 (1944). There is no statutory authorization for retroactive ratemaking in the form of the CPY, much less a statutory mandate.

As an example of an extraordinary expense, the Board referred to *Narragansett Electric Co.* v. *Burke, supra,* where the costs of restoring electric service after an extraordinary winter storm were held to be allowable as an extraordinary expense. In the *Burke* case, the Rhode Island Supreme Court described extraordinary expenses in the following terms:

"Extraordinary expenses" flow from an extraordinary storm. An extraordinary storm is "not necessarily an unprecedented one, but one that happens so rarely that it is unusual and not ordinarily to be expected." *Spitzer* v. *City of Waterbury,* 113 Conn. 84, 90, 154 A. 157, 160 (1931).

*Narragansett Electric Co.* v. *Burke, supra,* 415 A.2d at 178. The dictionary defines "extraordinary" as "going beyond what is usual, regular or customary"; "exceptional to a very marked extent." Webster's New Collegiate Dictionary (1981).

The Board's order of July 2, 1982, describes Central Vermont's fuel costs and the energy portion of purchased power expenses as "volatile." It also found that the demand costs related to purchased power contracts "are a significant portion of [Central Vermont's] total operating costs, fluctuate over time and cannot be controlled by the Company." However, when the Department suggested that the downward adjustment of approximately $1,290,000 required by the CPY tariff filing of December 15, 1982, was confiscatory in violation of the 14th Amendment, the Board concluded that the adjustment was "a modest one (barely more than one percent of revenues)" and that there was no evidence that the adjustment would result in "confiscatory rates" to the company.

■■ Thus, although the costs covered by the CPY tariff are a significant portion of total operating costs (over 50%), volatile, and beyond the control of the company, nowhere in the Board's orders is there justification for treating them as extraordinary costs in 1982 or even as such on a regular annual basis. Absent such justification and absent statutory approval, we hold the CPY tariff to be an illegal form of retroactive rate-making. In making this statement, we do not mean to imply that extraordinary costs should automatically be accorded special treatment. Economic risks are part of the utility business, and even the risk of economic catastrophe may properly be assigned to the owners of a utility company rather than to its consumers. *Petition of Central Vermont Public Service Corp.,* *supra,* 116 Vt. at 220, 71 A.2d at 585.

### III.

One other aspect of the CPY tariff warrants consideration. The CPY tariff focuses virtually all of its attention on the costs of purchased power and energy, amounting to more than 50% of Central Vermont's total operating costs. Other important factors in a rate case, such as rate base, rate of return, and the many other expenses that have an economic impact on a utility's operation are relegated to a minor role, with the utility required only to submit budget data of its projected operations. When a utility knows that it will be able to recover today's expenses through tomorrow's rates, the incentive to keep expenses down diminishes. *Narragansett Electric Co.* v. *Burke,* *supra,* 415 A.2d at 179. The knowledge that reimbursement is assured—or virtually so, in the absence of an egregious miscalculation or misstep on its part—cannot help but affect the company's decisions as to choice of generating units to use from time to time, fuel contracts, alternative sources of purchased power, energy-saving promotions, and even investments in future construction. The wisdom of such an approach is truly suspect, and contrary to the mandate of 30 V.S.A. § 218 (b) that the Board "through the establishment of rates of return, rates, tolls, charges or schedules shall encourage the implementation by electric . . . utilities of energy-efficiency and load management measures which will be cost-effective for the utilities and their customers on a life cycle cost basis."

One of the goals of the CPY, stated by the Board in its February 17, 1983, opinion, "is to reduce the scope and frequency of major rate cases," and there is no intention of "conducting a rate-case-as-usual proceeding." Presumably, this means that the Board will make no in-depth study or analysis of other items of income and expense, the composition of the rate base, or even the rate of return. We recognize that rate cases are expensive and time consuming and that the Board saw in the CPY an opportunity to reduce both time and expense. However, we reiterate the holding of *In re Green Mountain Power Corp., supra*, 142 Vt. at 384, 455 A.2d at 827, that selective updating, that is, the updating of one cost factor alone "without giving attention to whether that cost factor was itself something needing evaluation or adjustment because of transitory or abnormal factors, or without assessing other, related cost or revenue changes concurrent with it," is a "forbidden procedure." The CPY tariff, with a "true-up" that focuses almost exclusively on power and energy costs and pays scant attention to other important factors, clearly violates this precept.

*The orders appealed from are reversed, and the causes are remanded for further proceedings not inconsistent with the views expressed herein.*